### JONES v. EVANS.
No. 2560.

Court of Customs and Patent Appeals.
Jan. 21, 1931.

198

·Charles E. Tullar, of Schenectady, N. Y. (Claude H. Mott, of Schenectady, N. Y., of counsel), for appellant.

Frank H. Hubbard, of Milwaukee, Wis., for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

The appellant, Benjamin W. Jones, filed his application for a patent on improvements in motor control, on January 9, 1922. The appellee, Clarence T. Evans, filed his application for what is concededly the same device, on April 22, 1921. Thereafter an interference was declared by the Patent Office, which involved the following counts:

"1. A control system for electric motors comprising resistance in the motor circuit, electromagnetic switch mechanism for controlling the resistance, means operated responsively to the value of the motor current for holding the said switch mechanism in the open position and means responsive to· the rate of change of a motor operating condition for controlling the closing of said switch mechanism.

"2. A control system for electric motors, comprising resistance in the motor circuit, electromagnetic switch mechanism for controlling the resistance, means responsive to the value of the motor current for initiating the operation of the said switch mechanism, and means responsive to the rate of change of a motor operating condition for controlling the subsequent operation of the said switch mechanism.

"3. A control system for electric motors, comprising a resistor, electro-responsive switch mechanism for controlling the resistor, and means for regulating the supply of current to operate the said switch mechanism in accordance with the rate of change of the potential difference between points of the motor circuit and a time function."

Testimony was taken by both parties, and the Examiner of Interferences, in a lengthy and well-considered decision, awarded priority of invention of the subject-matter covered by counts 1 and 2 to the appellant and junior party, Jones, and of count 3 to the appellee and senior party, Evans. The Board of Appeals took a somewhat different view of the matter and found that the appellant, Jones, though first to conceive the invention covered by counts 1 and 2, had failed to establish diligence from April, 1921, when Evans entered the field, up to the date of Jones' reduction to practice on September 27, 1921. Therefore priority was awarded on all counts to the appellee, Evans. Jones has appealed, and the only matter now involved in this court is the correctness of the decision of the Board of Appeals in awarding priority to the appellee as to counts 1 and 2. There is no contention that Evans conceived the invention prior to April 13, 1921.

The appellant contends that he conceived the invention covered by said counts in the period between February 1, and February 19, 1921; that he disclosed the invention and made a written description of the same on February 19th; that he made the first drawing of his invention on February 23d, and reduced the invention to practice during the latter half of the month of March and the first half of the month of April, in the year 1921. He further contends that, from the time immediately prior to the entrance of the party Evans into the field, up to the date of the filing of his application on January 9, 1922, he was diligent.

Evans claims that he conceived the invention in the early part of 1921, and not later than April 13th; that he disclosed his invention to others, made a drawing of the same and a written description of the invention during the same period, and that he constructively reduced the invention to practice on April 22, 1921, by filing his application for patent.

In his brief and argument, appellee contends that the appellant should not prevail as to said counts 1 and 2, because, first, there was no proof of reduction to practice of the invention described in said counts, and, second, that the appellant was not diligent from the time immediately prior to April 22, 1921, up until the time he filed his application for patent on January 9, 1922.

The device which is the subject of the controversy here is a system of control by which electric motors may be started and operated without shock and possible injury thereto by the application of the power direct to them. The system of control heretofore known to the art is to apply, in the electric circuit by which the motor is caused to function, various resistances. These have a tendency to retard the current and prevent it from damaging the motor by too heavy a rush of current. These resistances are cut out by the action of the current so that gradually, as the motor accelerates, the resistance lessens and finally the full force of the current becomes available to the motor. The improvement consists of the interposition of a transformer and relays in the motor circuit, and its operation is fairly well explained by the following portion of appellant's specification:

"* * * Assume that line voltage is supplied to the two lines labeled L1, L2 and that the control switch is open as indicated. Under this condition the bottom coil of the left-hand relay will be connected directly across the tips of contactor 1. This potential across the tips of line contactor 1 will be sufficient to cause the armature of this relay to be attracted towards the coils and open its control contact. When the control switch is closed for the purpose of starting the equipment, a circuit will be made for energizing the coil of contactor 1. This will close the contacts of contactor 1, which will cause a current to flow through the coils of the two transformers through the tip of the contactor 1, through the resistor R1, R2, R3 and through the motor armature and series field to the other side of the line. This will cause the motor to start. When contactor No. 1 closes, it will short-circuit the lower coil of the left-hand relay which will cause the flux in this coil circuit to diminish towards zero. If there was no other force acting on the armature of this relay, the armature would release and close the contacts of the relay, after an interval of time. However, due to the changing current in the line circuit caused by the motor accelerating, there will be induced in the secondary of this transformer a current which is proportional to the rate of change of the motor current. This induced current will flow through the upper coil of this left-hand relay and prevent it from releasing until the rate of change of this current has diminished to a prescribed rate. At this time the armature will release and permit the coil of contactor 2 to become energized and thereby close. When contactor 1 initially closed, the upper coil of the right-hand relay received a potential equal to the drop across resistor R1, R2. This energization of the upper coil of the right-hand relay caused the armature of this relay to be attracted towards the coil and open its control contacts. Therefore, at the time when contactor 2 closed as above described, the upper coil of the right-hand relay became short-circuited in a manner similar to the lower coil of the left-hand relay. The action of the right-hand relay is similar to that of the left-hand relay, in that after the upper coil has been short-circuited and after an elapse of time, and after the rate of change of the current in the motor circuit has diminished to a prescribed value, the armature will release and allow the coil of contactor 3 to become energized and thereby close. It therefore follows that the combination of transformers, relays, contactors and motor shows an arrangement which causes the motor to be accelerated in accordance with a rate of change of an electrical condition of the motor and of a time function."

The appellant, at the time of his alleged conception of the device in question, was in the employ of the General Electric Company, the assignee of appellant's claim herein, and at the time of testifying herein, on December 2, 1926, had been employed in the engineering department of that company for 17 years. It was his duty to conduct experiments and research upon methods of applying control and improving various lines of electric control; that is, the control of electric motors by means of various devices. Jones testified herein that he had conceived the invention, the subject-matter of this dispute, prior to February 19, 1921, and that on February 19, 1921, he communicated to R. B. Meckley, of the patent department of his company, the substance of his conception of the device in question here. The letter, which was preserved in the files of the company, was introduced in evidence. Accompanying this letter was a rough sketch made by Jones, and which is also in evidence. Every element of the transformer and relays which are the substance of the invention herein, are indicated plainly by this letter and the accompanying sketch. So plain were the disclosures that Mr. Meckley, upon re-

ceipt of the same, attached thereto a blue print of a standard control system, at that time well known to the art, and inserted therein, in ink, symbols to indicate the transformer and other items of the suggestions made by Jones, with the comment, "Transformer could be located inside the line switches instead of as shown." Meckley, whose testimony was stipulated into the record, fully corroborated Jones in this respect. There can be no doubt from a consideration of this letter and diagram, and the testimony of Jones and Meckley, that at that time Jones had a full and complete conception of the invention in question, and disclosed it to Meckley.

The following portion of Jones' letter is illuminating:

"The theory of operation is to have the above relays actuated consecutively by current transformers which are energized in their proper order and as long as the line current is changing, either going up or coming down, the secondary of the transformer will generate sufficient current to hold its relay against gravity. When the next transformer comes into action the preceding one becomes dead."

At the time Jones communicated with Meckley, he also sent copies of his letter to four other officials and employees in his company for their information. These were department heads of various departments interested in such work. At the time Jones conceived the subject-matter of the invention, he had been working with one Cousins, electrical superintendent of the Illinois Steel Company, who had developed a system of control, and Jones had been testing a sample equipment of this system. It was this testing which suggested to him the subject-matter of the invention herein. In the latter half of March, 1921, Jones testifies that a test of his proposed device was made by him. This test was conducted, as it appears, in response to a written suggestion made by R. H. McLain to J. E. Brobst, head of the industrial control engineering department of appellant's company, in which the investigation of Jones' proposed arrangement was urged. This letter was written February 24, 1921, and is in evidence. A shop order was also issued by the proper officials of the company, authorizing the charging of the expense of the test and the appropriation of funds therefor. This was in response to the request of J. E. N. Hume, of the power and mining department of appellant's company, written on April 30, 1921.

The test of March, 1921, was made in Building 12 of the Schenectady plant of the General Electric Company, and consisted of the Cousins' equipment, having added thereto the transformers and other features mentioned in applicant's proposed improvement. The arrangement of this test panel was the same as that shown by appellant's application herein, so he states. On March 21, 1921, the appellant made a sketch of the arrangement of his device used in this test. It is in evidence, and includes, as we understand it, every element of his application and patent herein. Jones testifies that from the letters and sketches introduced in evidence, he is of opinion that the tests were made on or near March 21, 1921. He states that in the test which was held at that time, the transformers caused the relays to remain in their attracted position until a definite rate of change had been obtained, and that the results were as anticipated by him in his disclosure to Meckley and the others. As a result of the tests, he found it necessary to have established a given proportion between the transformer and the relays, and, because of this, took immediate steps to have the consulting department of the company calculate these matters. In accordance with the general practice of the company, before putting a device out to the public for general use, he desired these calculations to be made so that the device, when used, might have a large factor of safety. His tests, as he states, extended over about a week's time. He was assisted in making them by one Crosby and one H. M. Bartin.

After the tests, it appears from the testimony of Jones that he desired to obtain a transformer of the correct size and ratio of winding, which would accomplish the desired results with a good margin of safety, and, on April 16, 1921, requested R. E. Doherty, a member of the consulting department of his company, to investigate and make suggestions in this matter. A. H. Mittag was detailed by Doherty to follow this work. On May 25, 1921, Jones wrote to Doherty in regard to the subject-matter herein involved, asking him to charge the time in making these tests to the job or shop number which had been assigned, and informing him that the transformer used in this test was ready for his inspection. All this is established by the introduction of the letters in question in evidence.

It appears that in order to obtain this manufacturing or shop order, several departments co-operated to request such order, and that this was required by the rules of the

corporation to be approved by the division of accounting before it became effective. In addition, work could not be done on any device until such an order had been issued. It appears that Mittag communicated with the Pittsfield works of appellant's company, requesting data on transformers for the purpose requested by appellant, and that, afterwards, Mittag calculated the size of transformer which would be required. Appellant and Mittag tested these transformers, as appellant says, in the month of August, 1921. Several transformers were tested in various ways, with radio tubes and otherwise, to check upon the calculations which had been made. Several of the engineering force of the General Electric Company witnessed these tests. After the tests were made the patent department was given control of the matter, and requested to make an application for patent.

Albert H. Mittag testified that early in July, 1921, R. E. Doherty, hereinbefore mentioned, requested him to do certain work desired by the appellant, Jones, upon a device for automatically controlling the starting of a direct current motor, working on rate of change, "and our first work was on rate of change of motor current, that is, as long as there was a change going on in this current nothing was to happen, but when there was no change a step in the starting rheostat would be automatically short-circuited." He testifies that Jones had already made tests, and had used a 2-kilowatt transformer therein. The machines which Jones had used were shown to him at this time, and were in Building 12 of the General Electric Company. Mittag then wrote to the transformer engineers of his company at Pittsfield, for data on the transformer. He also discussed this matter with another consulting engineer of his company, and, after such discussions, made a large number of tests, using vacuum tubes. In September, 1921, he and Jones set up their apparatus and invited in other officials of the company for a test and demonstration. His calculations were begun early in July, 1921, and lasted up to approximately the middle of September, 1921. These final tests were made on September 23, 1921, and the witness was active in connection with the tests for a period of approximately one month to six weeks.

The witness John E. N. Hume, for many years employed by the General Electric Company, testified that in January, 1921, or in the early part of February of the same year, the appellant disclosed to certain of the engineers of his company the substance of his invention herein, and that, on April 29, 1921, Jones explained his system, with diagrams, to several of the officials, and, at this time, Jones was given authorization to proceed with the construction of a suitable transformer, and to make tests. He further states that he was present at the final tests which were made, and also states that he received a copy of appellant's letter of April 16, 1921, from Jones to Meckley, at or near the time it was written.

The stipulated testimony of Meckley is to the effect that he received the letter of appellant dated February 19, 1921, on February 23, and upon receipt of it made ink interlineations, showing how he understood Jones' suggestion could be carried out; that upon receipt of the letter the same day, he requested that a docket entry be made out on the matter by his company, so that patent protection might be obtained. He further states that on May 2, 1921, he instructed a draftsman for the patent department of his company to make drawings of the Jones application as soon as possible; and that within a month thereafter a drawing had been made. He states that he did not proceed immediately with the preparation of an application for patent at that time, because of the fact that Jones advised him he was having calculations made of the most effective design of transformer for the purposes which he had in view, and expected to make further tests before an application would be made. He states, further, that during the summer of 1921 he wrote several letters, requesting that the most effective design of transformer be determined as soon as possible, and that other steps should be taken as rapidly as they could be taken; that on September 27, 1921, he saw a final test of the control system in Building 12 of his company; and that the control system then tested was the same as that described in the application herein. Immediately thereafter he began a preparation of an application for patent, but found it necessary to instruct the Patent Office draftsman to make certain changes in the drawings, which work was begun on October 17, 1921. The claims were thereafter prepared, following the usual practice of the company, and the application was finally finished about a week prior to December 24, 1921, several conferences having been had with Jones immediately prior to that time. Certain minor corrections were made in the application thereafter, at the suggestion of Jones, and the draft was completed on December 28th, and filed on January 9, 1922.

A witness, Charles H. Chapman, states that he was employed by the appellant's company; that he assisted appellant in his early tests of his new system, but was not present at the final operation. He states, and this fact is given great force by appellee, that "this test was not considered entirely satisfactory, although some promise of better results was found to be possible."

It plainly appears, however, from his testimony, that the device which was tested, involved the matters in issue here, namely, the use of a transformer and relays similar in operation to those described in appellant's application.

Peter J. Mulvey testified that about the middle of February, 1921, he was called in to assist the appellant, Jones, and that in the latter part of that month he helped Jones make a test of the Cousins' system in conjunction with "some transformers that were connected behind the panel." At various times during the summer of 1921, according to this witness, tests were made on the Jones device. A panel was made under Jones' direction, and delivered to this witness on March 17, 1921, and was tested during that month, as he states, about "the middle of March."

This is the substance of appellant's testimony, and it is upon this showing that the Board of Appeals held as follows:

"On May 25, 1921 he wrote to Dougherty, Exhibit 8, telling him that the transformer used in the previous test was ready for his inspection. On May 31, 1921 an order for manufacturing the transformers had been prepared, Jones exhibit 9, but it was not until the early part of July, 1921 that Mittag was set to work on designing the transformers. (Mittag, Q. 7). He began his calculations early in July, 1921 (Q. 9) and did not furnish them until the middle of September, 1921 (Q. 10). The test was made on September 27, 1921. Here was a delay from April 16, 1921 to early in July, 1921 in setting Mittag to work, and from that time up to the middle of September seems to be a liberal allowance for the performance of this work. The work on the application ceased on June 1, 1921 and even if it was suspended on account of Mittag's work, he was not set to work until a month later. We are of the opinion that neither the preparation of the application nor the efforts to actually reduce to practice were carried on with proper diligence."

We are unable to coincide with the view of the Board of Appeals in this respect.

It is true that any lack of diligence on the part of appellant's assignee, the General Electric Company, or its officials and employees, would be chargeable to the appellant, and vice versa. However, in deciding this matter, some consideration must be had of the difficulties which ensue when a device of as delicate and intricate a character as this is being perfected. Especially is this true when the various steps, by which the perfection of the device is to be brought about, necessarily must go through many different hands. We are of opinion that the facts shown by the record are sufficient from which to conclude that there was sufficient diligence shown on the part of appellant to justify a finding of priority of invention to him as to counts 1 and 2. He had taken the matter up, after his preliminary tests, with the proper officers of his company, and had immediately requested the data and calculations as to the proper type of transformer to be used. These data were being collected from other branches of the company, and we think it would be a manifest perversion of justice to say that the original inventor of this system of control should lose the benefit of his invention by the mere fact that a possible interval from April 16th to early in July elapsed, in which it does not affirmatively appear that any steps were being taken toward the filing of a proper application for patent. It may be that the machinery which appellant had set in motion in the General Electric Company was moving slowly, but not to such an extent, in our opinion, that the appellant should be caused to lose the fruits of his invention thereby.

The law, while it encourages and requires diligence in reduction to practice and in making application for patent, also admits of such delay in making application for patent as is reasonably required to test the thoroughness and utility of supposed inventions, and to prevent the Patent Office from being overloaded with applications for patents for crude and incomplete devices. Such has been the uniform holding of the Court of Appeals of the District of Columbia, the court having earlier jurisdiction of these matters, a holding in which we concur. Yates v. Huson, 8 App. D. C. 93; Griffin v. Swenson, 15 App. D. C. 135; O'Connell v. Schmidt, 27 App. D. C. 77; Woods v. Poor, 29 App. D. C. 397, 403.

Whether the test of March, 1921, may be considered a reduction to practice, or whether Jones shall have his rights established by a reduction to practice on September 27,

1921, is immaterial, in our view of the matter. We find he was not so lacking in diligence, at any period, as to bar his right to a patent.

We should not be understood as here announcing the doctrine that any different rule of diligence is required when a corporation is the party in interest in an application for patent and that in which an individual is involved. The same rule of diligence applies to both. Each case where diligence is involved, rests and must be decided upon its own facts, and all the surrounding circumstances must be viewed and considered in determining whether there was sufficient diligence. In this case, viewing the facts disclosed, as a whole, we think there was.

The decision of the Board of Appeals is reversed, and priority is awarded to the party Jones on counts 1 and 2 of the interference.

Reversed.