**CHARLES WOODS TELEVISION CORP., Appellant,**

v.

**CAPITAL CITIES/ABC, INC., Appellee.**

No. 88–2036.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 14, 1988.

Decided March 16, 1989.

Rehearing and Rehearing En Banc Denied April 20, 1989.

Before ARNOLD, Circuit Judge, BRIGHT, Senior Circuit Judge and JOHN R. GIBSON, Circuit Judge.

BRIGHT, Senior Circuit Judge.

Plaintiff-appellant Charles Woods Television Corporation (Woods TV) recovered a jury verdict of $3.5 million ($1.5 million actual damages plus $2 million punitive damages) resting on fraudulent misrepresentations allegedly made by defendant-appellee Capital Cities/ABC, Inc. to induce Woods TV to purchase and improve a television station then affiliated with the American Broadcasting Company (ABC).[1] Woods TV brought this action after ABC cancelled the affiliation. The district court,[2] however, rejected the jury verdict and granted appellee's motion for judgment n.o.v., or in the alternative, its motion for a new trial. From the adverse judgment, Woods TV brings this appeal, alleging that the trial court erred in setting aside the verdict and entering judgment for Capital Cities/ABC based on the court's determination that Woods TV failed to create a submissible case of fraud under Missouri law. Woods TV also questions on appeal certain evidentiary rulings of the trial court. For the reasons discussed below, we affirm the judgment.[3]

## I. BACKGROUND

Television station KMTC in Springfield, Missouri, became an ABC affiliate in 1966. Federal regulations provide that affiliation agreements between networks and local stations cannot exceed two years and that either party may cancel an agreement upon six months' written notice. 47 C.F.R. § 73.658(c) (1987). ABC renewed KMTC's affiliation agreement without interruption

Gary R. Cunningham, Springfield, Mo., for appellant.

Thomas F. Connell, Washington, D.C., for appellee.

1. The primary alleged misrepresentation occurred in June 1985. On January 3, 1986, ABC merged with Capital Cities and became a wholly owned subsidiary of that corporation. Thus, when Woods TV brought this action later that year, it sued Capital Cities.

2. The Honorable Russell G. Clark, United States District Judge for the Western District of Missouri.

3. In light of our disposition, we do not address Woods TV's claim that the trial court erred in granting a new trial as a lesser alternative to the judgment n.o.v. See 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2540, at 618 (1971).

through a renewal that became effective in January 1985.

On January 11, 1985, Woods TV signed a contract to purchase KMTC from Midland Television Corporation (Midland) at a later date for $13 million. The affiliation agreement between ABC and KMTC required that the network approve all assignments of affiliations to purchasers such as Woods TV. In a letter dated February 15, 1985, however, ABC informed Woods TV and KMTC that Telepictures Corporation (Telepictures) had asked to make a presentation to ABC in hopes of obtaining the Springfield affiliation for KSPR, an independent station Telepictures had recently purchased. The network invited both KMTC and Woods TV to make a presentation for retaining the affiliation, and transmitted to both parties an official policy book that outlined the network's criteria for evaluating competing applicants.

Charles Woods (Woods), the president and sole owner of Woods TV, testified at trial that he became concerned after reading the February 15 letter. While he understood that networks usually renew affiliation agreements routinely, ABC appeared to be putting the Springfield affiliation up for grabs. Woods requested ABC's position on KMTC retaining the affiliation, but Richard Kozak, ABC's vice president for affiliate relations, responded in a letter dated March 15, 1985, that the network could not state its position until after it had evaluated the competing presentations.

The ABC Affiliation Policy Book, which was introduced into evidence at trial, outlines the procedure the network generally follows in deciding whether to switch affiliates. First, the vice president for affiliate relations evaluates the presentations, ratings data and engineering reports, and thereafter submits a recommendation to the Affiliation Review Committee. This committee, composed of representatives from various network departments, then reviews the matter and makes a formal recommendation whether the network should switch the affiliation. The vice president for affiliate relations delivers the committee's recommendation to the presi-

dent of the ABC Television Network, who has authority to make the final decision.

KMTC and KSPR each delivered presentations to the Affiliation Review Committee in April 1985. The committee met on May 21 to discuss the proposals. By all accounts, the committee members stated that KSPR gave a superb presentation. Although most members leaned toward switching the affiliation to KSPR, the engineering department favored remaining with KMTC. The committee tabled the decision without taking a formal vote.

Kozak then reported to George Newi, the president of the ABC Television Network, a subsidiary of ABC Television, that the committee was leaning strongly toward changing affiliates. While Newi tended to agree with the switch, he decided to discuss the matter first with his immediate superior, Mark Mandala, the president of ABC Television. Mandala in turn suggested that he, Kozak, Newi, and Robert Kaufman, a network attorney and committee member, meet with Everett Erlick, an executive further up the chain of command who served as ABC's general counsel and as a member of the network's board of directors. At this meeting, Erlick recommended that Newi and Kozak defer any final decision on the Springfield affiliation, and they concurred. Although the exact date of the meeting is unclear, it occurred sometime in May or June of 1985.

ABC granted written approval to the assignment of the affiliation from KMTC to Woods TV on May 28, 1985. The network reiterated, however, that it still was considering a switch of stations and that it reserved the right to terminate the affiliation upon six months' notice. After receiving this letter, Woods called Kozak and said that he planned not to close the purchase of KMTC because the affiliation remained in doubt.

On June 20, 1985, Kozak sent a letter to Woods, Telepictures, and KMTC's president Kenneth Meyer stating that the network had decided to defer a decision on the affiliation switch for at least the rest of 1985. Woods, nevertheless, closed the purchase of KMTC on July 17, 1985, after

negotiating a $5 million price reduction in the event that ABC terminated the affiliation before July 1986. After Woods purchased the station, he changed its call letters to KDEB. ABC terminated KDEB's affiliation on April 3, 1986.

Thereafter, Woods TV filed this suit for fraud in Missouri state court, and Capital Cities/ABC removed the action to federal court on diversity grounds under 28 U.S.C. §§ 1332 and 1441. After a six-day trial, a jury awarded Woods TV a total of $3.5 million, including compensatory damages and punitive damages. Capital Cities/ABC then moved for judgment n.o.v., or alternatively for new trial, on the grounds that Woods TV had failed as a matter of law to establish the elements of fraud under Missouri law. The trial court granted the motion. This appeal by Woods TV followed.

## II. DISCUSSION

### A. Judgment N.O.V.

Woods TV's fraud claim focuses on an allegation that ABC misrepresented the true facts when it stated in the June 20 letter that the network had not decided yet whether to switch the affiliation to KSPR.[4] Woods TV contends that ABC already had decided to switch, but deferred announcing the decision because it feared possible litigation that could cause a "flap" or "glitch" in the pending Federal Communications Commission (FCC) approval of the merger of ABC and Capital Cities. In addition, Woods TV argues that it relied on the representation that the affiliation decision remained open when it purchased KMTC and improved the station's facilities and programming.

■ Under Missouri law, a plaintiff alleging fraud must establish the following elements:

1) a representation, 2) its falsity, 3) its materiality, 4) the speaker's knowledge

of its falsity, or his ignorance of its truth, 5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated, 6) the hearer's ignorance of the falsity of the representation, 7) the hearer's reliance on the representation being true, 8) his right to rely thereon, and 9) the hearer's consequent and proximately caused injury.

*Country Shindig Opry, Inc. v. Cessna Aircraft Co.*, 780 F.2d 1408, 1411 (8th Cir. 1986) (quoting *Sofka v. Thal*, 662 S.W.2d 502, 506 (Mo.1983) (en banc)). A failure to make a submissible case on any one of the elements defeats the entire claim. *Craft v. Metromedia, Inc.*, 766 F.2d 1205, 1218 (8th Cir.1985), *cert. denied*, 475 U.S. 1058, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986).

■ Although a party alleging fraud under Missouri law may establish each element with circumstantial evidence, that proof must rest on "something more substantial than suspicion, surmise, and speculation." *Glass Design Imports, Inc. v. Import Specialties*, 867 F.2d 1139, 1142 (8th Cir.1989). "[A] party's case will fail if he can show only facts and circumstances which are equally consistent with honesty and good faith." *Craft*, 766 F.2d at 1218. In addition, "[t]he language of an alleged misrepresentation must be considered in light of the background in which the statements were made and the context in which the words were used." *Id.* at 1220.

■ In this case, the trial court granted judgment n.o.v. because it decided that Woods TV had failed to make a submissible case on four elements of fraud: misrepresentation, intent to induce action, reliance, and damages. In reviewing this determination, we must apply the same standard as the trial court. *Washburn v. Kansas City Life Ins. Co.*, 831 F.2d 1404, 1407 (8th Cir.1987). A judgment n.o.v. should be granted only when the evidence, viewed in

---

4. In the June 20 letter, Kozak stated in pertinent part:
We have decided to defer a decision on future affiliation in Springfield for at least the balance of 1985. This will allow time for the parties to construct any improvements in facilities with which they may elect to go forward and to make

any changes which they may decide upon. It will also allow us to study the matter further and give us the opportunity to examine the November rating books. We will evaluate the situation again in early 1986 in light of all the facts and circumstances at that time.

the light most favorable to the prevailing party, "points one way and is susceptible of no reasonable inferences sustaining the position of the non-moving party." *Sunkyong Int'l, Inc. v. Anderson Land & Livestock Co.*, 828 F.2d 1245, 1248 (8th Cir. 1987). Based on the record before us, we affirm the grant of judgment n.o.v. in this case.

### 1. Misrepresentation

■ The June 20 "no decision" letter from Kozak to Woods constituted a misrepresentation only if ABC at the time already had decided to switch the affiliation to KSPR. At trial, Woods TV introduced evidence that Newi, Kozak, and the committee favored the switch in May 1985. The ABC policy manual in evidence granted Newi authority to make the final decision. Thus, Woods TV argues that the jury could determine that ABC had effectively made a final decision to switch before sending the June 20 letter.

This theory emphasizes the procedure outlined in the policy manual, but in that manual the network also expressly reserves the right to deviate from the otherwise standard procedure. Moreover, this theory disregards the realities of decision-making in a hierarchal corporate management structure. The evidence establishes that although Newi and Kozak favored the switch, on the advice of one of their superiors, Everett Erlick, they deferred making a decision. The policy manual did not prevent them from seeking the advice of a superior. Proof of the subjective leanings of middle management in May cannot es-

tablish that a corporate decision had occurred before June 20.

■ Woods TV argues that Erlick effectively vetoed the switch solely because he feared that potential lawsuits by Woods TV, KMTC or Telepictures might cause a "flap" or "unnecessary glitch" in the pending FCC approval of the merger of ABC and Capital Cities. Even if the merger to some degree motivated Erlick to recommend deferral, ABC's motivation for its actions does not establish that the network in fact had made a final decision in June 1985. The fear of litigation just as easily could have caused the network to defer making any decision at all at that time.

The undisputed evidence shows that ABC tabled the matter entirely until it reviewed the November ratings at the end of 1985. Because these ratings proved inconclusive, ABC waited for the February 1986 ratings before reviewing the matter again.

In March and early April of 1986, the research and engineering departments submitted further reports comparing the ratings and facilities of KDEB and KSPR. Based on these reports, and spurred by Woods' further requests for a decision, Newi sent Mandala a formal recommendation on April 3, 1986, that ABC switch the affiliation. Mandala approved the recommendation that day, and Newi called Woods TV to announce the decision.[5]

■ In light of this undisputed evidence, the district court correctly determined that no reasonable jury could conclude that ABC made a false representation when it stated in the June 20 letter that the network had not decided whether to switch affiliates.[6]

---

**5.** After ABC merged with Capital Cities in January 1986, Capital Cities drastically reduced the size of the Affiliate Relations department. As part of this restructuring, the company released Kozak. Newi assumed Kozak's duties, while Mandala assumed Newi's former position.

**6.** Woods TV also argues that ABC committed fraud by "concealment" and by misrepresenting that the network would base its decision solely upon the criteria of technical improvements, operating changes, and ratings. These theories, however, were not before the jury and therefore "may not provide the basis for upholding the jury verdict." *Country Shindig Opry, Inc. v.*

*Cessna Aircraft Co.*, 780 F.2d 1408, 1412–13 (8th Cir.1986).

Even if these theories were properly before us on appeal, we would find them to lack merit. First, because ABC had not made a decision in June 1985, it had nothing to conceal. Thus, the concealment claim and the misrepresentation claim seem to be one and the same. If the verdict will not stand on misrepresentation, it cannot stand on concealment. Further, evidence is lacking to establish that ABC represented to Woods TV that the network would base its decision only on the three criteria. The June 20 letter clearly informed Woods TV that the deci-

While the foregoing discussion is dispositive, we nevertheless briefly comment on the failure of proof upon other elements necessary for Woods TV to have made a submissible case of fraud.

### 2. Intent to Induce Action

■ No jury could reasonably find that ABC intended the June 20 letter to induce Woods TV to purchase KMTC and make improvements. To the contrary, ABC warned Woods in five letters and in several phone conversations that the network was seriously considering switching the affiliation to KSPR.

### 3. Reliance

■ Woods TV also failed as a matter of law to prove it relied on ABC's alleged misrepresentations in buying the station and making improvements. The undisputed evidence shows that ABC's repeated warnings of a potential switch caused Charles Woods to inform Kozak that Woods TV no longer planned to close the purchase of KMTC. Woods decided to go ahead and close the transaction only after he, at the suggestion of a broker, negotiated an addendum to the purchase agreement whereby Woods TV would receive a $5 million reduction in the price of the station if ABC terminated the affiliation. As Woods testified at trial:

Q Upon receipt of [the June 20] letter, what did you decide to do?

A I still was not going to buy the station because the affiliation was still in doubt.

Q But with regard to closing, did you buy the station?

A Yes. We bought the station.

Q Why did you buy the station?

A Sometime after this letter, the broker, Mr. Houston, got in touch with me, and he proposed some type of a plan whereby in the highly unlikely event that we didn't get the affiliation agreement—

sion would be based on "all the facts and cir-

if it were canceled—there would be a reduction in price on the station.
Tr. 124.

According to that evidence, in deciding to close the deal and purchase KMTC, Woods relied not on the June 20 letter, but on his own business judgment that the price reduction he negotiated would protect him from the known risk that the station could lose the affiliation. *See Empire Gas Corp. v. Small's LP Gas Co.,* 637 S.W.2d 239, 243–44 (Mo.App.1982). We also note that in seeking financing for the purchase, Woods represented to a bank that the station would perform equally well as an independent. In light of the above factors, no reasonable jury could conclude that Woods relied on ABC's letter.

### B. Evidentiary Issues

Woods TV also contends that the district court erred in (1) excluding testimony about conversations ABC officials had with outside counsel concerning the effect of a switch on the pending merger and (2) permitting the jury to consider the price adjustment addendum to the purchase agreement. We may not disturb these evidentiary rulings "absent showings of abuse of discretion and resulting prejudice." *Sedco Int'l, S.A. v. Cory,* 683 F.2d 1201, 1207 (8th Cir.), *cert. denied,* 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982). Under this standard, no abuse of discretion or prejudice occurred in this case.

■ The trial court properly excluded on the grounds of attorney-client privilege testimony by Newi concerning a phone call ABC officials placed to the network's outside counsel for the pending merger to discuss the effects of a possible affiliation switch. Contrary to Woods TV's assertion, this communication did not fall within the narrow exception to the privilege doctrine for cases in which a defendant attempts to use the privilege to conceal fraud. *See* Mo.Rev.Stat. § 491.060(3) (1949 & Supp. 1989). The exception does not apply here because Woods TV failed to make a prima facie showing that ABC communicated with outside counsel in furtherance of a

cumstances."

fraud and that the communication bore a close relationship to the fraud. *Pritchard–Keang Nam Corp. v. Jaworski*, 751 F.2d 277, 281–83 (8th Cir.1984), *cert. denied*, 472 U.S. 1022, 105 S.Ct. 3491, 87 L.Ed.2d 625 (1985). Moreover, this information tended only to establish ABC's motives for its actions—a point that bears little relevance to the real issue of whether ABC already had decided to switch before June 20, 1985. *See supra* p. 1160.

Furthermore, Woods TV's argument that ABC waived the privilege at trial also lacks merit. Although the network's witnesses testified generally about the effects of the merger, they never mentioned the particular communication in question. Finally, even if exclusion of the testimony as privileged constituted error, no prejudice occurred because Woods TV presented substantial other proof of ABC's motives.

The district court also did not abuse its discretion in permitting the jury to consider the addendum to the purchase agreement. Woods TV incorrectly asserts that the "collateral source" rule precludes admission of the addendum. That rule, however, only prevents a tortfeasor from reducing or mitigating the damages against him by proving the plaintiff has received indemnity or compensation payments from an independent, collateral source for the injury caused by the tortfeasor. *See Iseminger v. Holden*, 544 S.W.2d 550, 552 (Mo.1976) (en banc); *Spengel v. Kantor*, 736 S.W.2d 51, 52 (Mo.App.1987). In this case, Woods TV negotiated the addendum before it purchased the station to prevent it from suffering any injury at all. Thus, the addendum was not a "collateral source."

Additionally, ABC introduced the addendum not only on the damages issue, but to prove that Woods TV did not rely on the representations. As noted above, the addendum is highly probative on the reliance issue, and thus is not "collateral" to the fraud claim. Therefore, the collateral source rule does not apply. *See Burrous v. American Airlines, Inc.*, 639 S.W.2d 263, 266 (Mo.App.1982).

## III. CONCLUSION

We affirm the judgment of the district court granting Capital Cities/ABC's motion for judgment n.o.v.